### In the Matter of TM MONROE MANOR ASSOCIATES LTD., a Georgia limited partnership, Debtor.

Bankruptcy No. A90–12200–ADK.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

April 16, 1991.

Lawrence S. Burnat, Schreeder, Wheeler & Flint, Atlanta, Ga., for movant.

Robert E. Hicks, J. Michael Levengood, Maloof & Campbell, Atlanta, Ga., for respondent.

## ORDER

A. DAVID KAHN, Chief Judge.

The above-styled bankruptcy case is before the Court on the approval of Debtor's First Amended Disclosure Statement. A hearing was held on February 21, 1991, after which the matter was taken under advisement. The issues now before the Court involve the confirmability of Debtor's Plan.

TM Monroe Manor Associates, Ltd. (Debtor) is a Georgia limited partnership formed in 1983 to own and operate an apartment complex ("the Property") located in Atlanta, Georgia. The Property was purchased by Debtor from first Equities Corporation for $8,000,000, who had pur-

chased the property from Belcore & Associates, Inc. ("Belcore") for $8,000,000. Of this purchase price, $6,500,000 was satisfied by a nonrecourse purchase money wraparound promissory note (the "Note"). The Note is secured by a wraparound deed to secure debt held by Belcore which encumbers the project. On November 15, 1990, the Court entered an Order setting the value of the Property at $7,725,000 for all purposes during the bankruptcy case.

On January 11, 1991, Debtor filed its First Amended Plan and Disclosure Statement. Debtor's proposed Plan of Reorganization provides for Belcore's secured claim as follows:

*CLASS V.* (a) The Allowed Claim of Belcore, the holder of the Belcore Lien, shall be repaid in full upon confirmation. Beginning on the first day of the first month following the Effective Date of the Plan and continuing on the first day of each month thereafter until maturity, interest only payments shall be due on the Note in an amount equal to: (i) interest computed at the prime rate of 9.75% per annum on the outstanding principal balance of the Belcore Note up to $6,566,250 (being 85% of the Appraised Value of the Project) plus (ii) interest at the rate of 11% on the outstanding principal balance (if any) of the Belcore Note exceeding $6,566,250. The Belcore Note shall have a maturity date of the fifth (5th) anniversary of the Effective Date at which time all outstanding principal and accrued interest shall be due and payable.

(b) In calculating the outstanding principal balance of the Belcore Note as of the Effective Date, all allowed accrued interest, allowed default interest, allowed late charges and actual attorneys fees incurred by Belcore shall be added to the principal balance of the Belcore Note. The total principal claim of Belcore shall be reduced by the amount by which the total claim of Belcore exceeds $6,550,000. All payments of interest described in the above paragraph shall be made based upon the principal balance of the Belcore Note as provided for in this paragraph.

*In exchange for the reduction in principal described herein, Belcore shall receive a class B limited partnership interest as described hereinafter.* (emphasis added).

.    .    .    .    .

*Class VI.* The partnership agreement shall be amended to provide for the creation of a new class of limited partner interests called the Class B Limited Partnership Interest to be held solely by Belcore.

The Class B Limited Partnership Interest shall be allocated that percentage of the profits, credits, losses, and deductions of the partnership and any Cash Flow commensurate with the percentage derived from the following formula:

$$\text{Partnership percentage} = \frac{(\text{Belcore Claim amount}) - \$6,550,000}{(\text{Appraised Value of Project}) + (\text{Limited Partner contributions}) - (\$6,550,000)}$$

The Class B Limited Partnership Interest shall be established ninety (90) days following the Effective Date after all existing limited partner contributions have been received. The partnership agreement shall be modified to allow admission of the new partners and the sale of additional limited partnership interests upon such terms and conditions as the managing general partner deems just and equitable.

In essence, Debtor is proposing to convert a substantial portion of Belcore's claim into a limited partnership interest in the reorganized Debtor by creating a special partnership class to be held solely by Belcore. Debtor asserts that this debt to equity "swap" which creates a special class of claim is fair and equitable because it allows Belcore to realize the indubitable equivalent of its claim. Conversely, Belcore asserts that the creation of an ownership interest in the Debtor is prohibited, and the Plan cannot be confirmed as a matter of law.

Section 1129(b), the Bankruptcy Code's cramdown provision, requires that a plan be "fair and equitable" in order to confirm a plan over a dissenting class of creditors. Section 1129(b)(2) provides as follows:

For the purposes of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

.    .    .    .    .

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2). According to the legislative history of 11 U.S.C. § 1129, unsecured notes as to the secured claim or equity securities of the debtor would not be considered an indubitable equivalent. *See* 124 Cong.Rec. H11, 104 (daily ed. Sept. 28, 1978).

■ A secured claim may be satisfied with property other than the specific collateral. If a reorganization plan proposes to satisfy an allowed secured claim with anything other than the secured creditor's collateral, a court must examine (1) whether the substituted security is completely compensatory and (2) the likelihood that the secured creditor will be paid. *See Metropolitan Life Insurance Company v. San Felipe & Voss, Ltd., (In re San Felipe & Voss, Ltd.),* 115 B.R. 526 (Bankr.S.D.Tex. 1990). In *San Felipe,* the debtor proposed to offer a secured creditor equity securities in a third-party purchaser as the indubitable equivalent of the creditor's claim. The court confirmed the plan, reasoning that while the use of *equity securities in the reorganized debtor* was not contemplated in the Bankruptcy Code, the use in cramdown of *equity securities in a third-party purchaser* was not prohibited as long as the securities at issue were stable and there was a substantial equity cushion in the offered stock. *Id.* at 529 (emphasis added).

■ Debtor has cited recent authority for the proposition that transfers of property other than cash can constitute the indubitable equivalent for cramdown purposes. *See In re Sandy Ridge Development Corp.,* 881 F.2d 1346 (5th Cir.1989); *see also In re Sun Country Development,* 764 F.2d 406 (5th Cir.1985). However, these

decisions do not support Debtor's proposed use of a partnership interest as the indubitable equivalent of a secured creditor's claim. In *Sandy Ridge*, the court confirmed a plan wherein the debtor proposed to return the entire collateral to the secured creditor in partial satisfaction of the debt. In *Sun Country*, the secured creditor received promissory notes secured by real estate that was not already collateral for the secured claim, and the value of the new collateral was twice as much as the secured creditor's claim. *Id.* While these decisions do address the indubitable equivalent standard, the cases do not condone reorganization plans in which a creditor is to receive a specific interest in the reorganized debtor.

 In the case *sub judice*, Debtor's proposed treatment of Belcore's claim does not provide a satisfactory substitute for Belcore's collateral and is unconfirmable as a matter of law. The proposed interest which Belcore would receive in the Plan is not completely compensatory, and it is very likely that Belcore would never be able to receive any value for this partnership interest. The securities offered are a high risk limited partnership in the Debtor, and there is no probable market in which Belcore could liquidate this tenuous interest. Moreover, requiring Belcore to effectively become a partner with Debtor would create several potential conflicts in operating the property, all of which would doom Debtor's prospects of reorganization. Debtor's alternative suggestion to offer Belcore a joint tenancy in the Property is equally unacceptable inasmuch as the Property is already security for Belcore's debt. Even if the concept of indubitable equivalent were stretched so as to include an offer of joint tenancy or tenancy at common in property which already secures a creditor's debt, there again would be no reasonable expectation that the interest could be satisfactorily liquidated given Debtor's current status. The Court is not willing to disregard Congressional intent and confirm a Plan which forces a secured creditor to expose itself to a greater risk than the creditor had ever contemplated initially. Therefore

IT IS THE ORDER OF THE COURT that approval of Debtor's First Amended Disclosure Statement be, and the same hereby is, DENIED.

IT IS SO ORDERED.